UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
------------------------------------------------------- X
                                     :

STEVEN BATTLE, *pro se*,               :           **<u>OPINION AND ORDER</u>**
                                     :           06-CV-1312 (DLI)
                    Petitioner,      :

             -against-           :

DALE ARTUS,                      :

                                  :

                  Respondent.    :

                                  :
------------------------------------------------------- X
**DORA L. IRIZARRY, United States District Judge:**

     *Pro se* petitioner Steven Battle is currently serving a thirteen-year prison sentence following his conviction in New York State Supreme Court, Richmond County, for Robbery in the Second Degree, New York Penal Law § 160.10(1), Assault in the Second Degree, New York Penal Law § 120.05(5), and Criminal Possession of Ammunition, New York Admin. Code § 10-131(I). Pursuant to 28 U.S.C. § 2254, he challenges his conviction, claiming that: (1) he was denied a fair hearing on his allegation of juror misconduct because the New York State Supreme Court, Appellate Division, Second Department ("Appellate Division") refused to release the names and addresses of all the jurors; (2) juror misconduct denied him an impartial jury; (3) the trial court gave an unbalanced charge under *Allen v. United States*, 164 U.S. 492 (1896); and (4) the trial court mishandled a note from a juror that explained her assessments of the prosecution's case. For the reasons set forth below, the

1

petition is denied.

I. Summary of the Facts

    a. Background

On December 19, 1999, at approximately 1:35 P.M., Dennis Powell walked past petitioner on his way to babysit his godchildren. (Trial Transcript ("TR") at 166-67.) Petitioner and Powell had known each other for approximately three or four years. (Tr. at 159-60.) At the time, Powell was wearing a Rolex watch, an earring, and a chain with a medallion. (Tr. at 167.) At approximately 1:45 P.M. that same day, petitioner and an accomplice knocked on the door of the apartment where Powell was babysitting. (Tr. at 155-57.) When the door was opened,[1] petitioner's accomplice held Powell up at gun point while petitioner ordered Powell to hand over his watch, wallet, and jewelry. Powell complied. Petitioner also snatched the chain from Powell's neck. (Tr. at 156-159.) Then, petitioner beat Powell in the face with the gun, knocked him to the ground, and petitioner repeatedly stomped him. (Tr. at 18, 156, 159.)[2] All of this occurred in the presence of Powell's three godchildren, all of whom had known petitioner for years and had seen him almost every day. (Tr. at 29-32, 35-37, 57, 62-64, 75-80, 126-127, 129-33.)

After petitioner and his accomplice left, one of the children called the police. (Tr. at 91.) Shortly afterwards, Officer Lawrence Fiorello and his partner arrived.

---

[1] There was conflicting testimony as to who actually opened the door: Powell or one of the children. (Tr. at 35, 78-79, 129.)

[2] Before leaving, petitioner's accomplice also took from the bedroom money, a watch, a ring, and a game that the children had received as an early Christmas present. (Tr. at 37, 39, 66, 82-83, 100, 132, 135-36.)

(Tr. at 3-4, 91.)   According to Officer Fiorello, Powell told him that he knew the person who robbed him, and he would "take care of it in his own way."   (Tr. at 9.) An ambulance then took Powell to Brookdale Hospital, where he was treated.   (Tr. at 2-6, 9, 13.)

Two days after the robbery, Detective John Williams interviewed Powell by telephone.   During this interview, Powell identified petitioner as the robber and assailant and provided petitioner's address.   (Tr. at 181-82, 184, 203-04.)   On December 21, 1999, at 6:00 P.M., Detective Williams, along with other officers, went to that address.   (Tr. at 183-84.)   Petitioner saw the police approaching and ran into his mother's apartment, where the police pursued and arrested him.   (Tr. at 185-86.)   The police recovered Powell's Rolex watch from the room to which petitioner had fled as well as .38-caliber bullets on his person.[3]   (Tr. at 161, 186-191.)

Powell testified before the Grand Jury, where he explained that petitioner robbed and assaulted him.   (Tr. at 153-59.)   At trial, however, Powell changed his testimony.   He denied that petitioner robbed and assaulted him and claimed that his godchildren were not present during the robbery.   (Tr. at 228-29.)   Powell acknowledged that he had previously identified petitioner as his robber and assailant.   (Tr. at 228).   Powell also testified about two events that occurred between that identification and when he called the prosecutor to change his story.

_____

[3] A ballistics test demonstrated that the bullets were operable, and petitioner was not an authorized ammunition dealer.   (Tr. at 188-89.)

(Tr. at 257.)   On the first occasion, a group of men approached Powell and threatened him.   One of them said, "My man can't stay in jail."   (Tr. at 250.)   One of those men had a gun.   (Tr. at 276.)   The second occasion was when petitioner's father offered to pay Powell for the jewelry that was taken.   (Tr. at 253-257.)

b.  Jury Deliberations

On September 20, 2000, at 12:15 P.M., the jury began to deliberate.   That afternoon, the court received several notes from the jury requesting Powell's grand jury testimony, trial exhibits, and additional instructions on reasonable doubt, which the court provided.   (Tr. at 368-370.)   At 3:20 P.M., the jury sent another note indicating that they had reviewed the case and were hung.   (Tr. at 370.)   With the consent of the parties, the court responded by instructing the jury to "make further effort and resume deliberations."   (Tr. at 371.)

At 4:18 P.M., the jury sent another note, stating that it was deadlocked "eleven to one, but one juror is absolutely not willing to work with the other jurors." (Tr. at 372.)   The court asked the parties for their opinions on how to handle the note, and they agreed that the court should instruct the jury to continue their deliberations.   (Tr. at 371-372.)   The court instructed the jury as follows:

> There is a tendency in human nature sometimes to become personally and even unreasonably stubbornly attached to a position for which we have argued.   Whether or not such a thing has occurred as a result of your deliberations, of course, we have no way of knowing.   But I ask each of you to reflect on the possibility that such a thing has occurred and to re-examine your position on the basis of your reflection.   If you are in the minority, consider whether your position is well taken in light of all the elements and the fact that the majority has a different view.   If you're in the majority, consider whether your position is well

founded.

> You are not persuaded solely because of the opinion of fellow jurors or for the purpose of returning a verdict, but those persuaded that guilt has not been established beyond a reasonable doubt as to a given charge are reminded that mathematical certainty, proof beyond all doubt is not required. Those persuaded that guilt has been established beyond a reasonable doubt as to a given charge are reminded that a mere probability of guilt is insufficient. It is your duty to those who hold a different view to listen with a disposition receptive to a reasonable and persuasive point and a willingness to change your mind, if appropriate on the basis of such a point. If stubbornness or a capricious attitude have [*sic*] crept into your deliberations, please try to eliminate them and make every effort to reach an unanimous verdict.

(Tr. at 372-374.) Neither party objected to these instructions.

Later that day, the court notified the parties that one of the jurors, Jocelyn Smith, a law student, had sent a three-page note. (Tr. at 375, 380.) The court clerk who had delivered the note explained that he believed the note contained Smith's explanation for her position in the deliberations. (Tr. at 375, 381.) Petitioner's counsel asked the court to read the note before the parties, but the court expressed concern that doing so may result in a mistrial if the note contained confidential information about the deliberations.[4] (*Id.*) Therefore, the court decided that, before reading the note, it would speak with Smith to determine whether it contained such information. (Tr. at 375-380.)

Smith explained to the court that the other jurors knew she wrote the note and it set forth her position and the underlying reasons. (Tr. at 381-382.) In light

---

[4] The trial court had previously stressed to the jurors the importance of keeping their deliberations confidential. (Tr. at 364-365.)

of her explanation, the court decided not to read the note and reminded Smith that the deliberations "are confidential and for the ears of the members of the jury alone and not appropriately published to the world at large or even to the Court and counsel." (Tr. at 381-382.) The court then called the jury into the courtroom and re-emphasized to them that they should keep their deliberations confidential. (Tr. at 383-84.)

Before the jury resumed their deliberations the next morning, the court read Smith's note to and with the consent of the parties. (Tr. at 387-389.) In the note, she explained that, after considering all of the evidence, she believed that the "State ha[d] not met its burden of proof for most of the counts of the indictment." (Tr. at 390.) Furthermore, she had been unable to convince the remaining jurors of her position, and they were unable to convince her, and she "cannot see any chance of [their] respective positions changing." (*Id.*) Smith also explained why she believed the prosecution had not met its burden. (Tr. at 391-96.) When asked by the court, neither counsel commented on the note. (Tr. at 397.) The jury then resumed deliberations. (*Id.*)

During the deliberations, the jury requested to review the physical evidence and portions of the trial testimony of the three children who witnessed the robbery. (Court Exs. 8 & 9; Tr. at 397-99.) The court provided this evidence, and later that day, the jury reached a verdict. (Tr. at 397-98.) The jury found petitioner guilty of Robbery in the Second Degree, Assault in the Second Degree, and Criminal Possession of Ammunition, but it acquitted him of Robbery in the First Degree. (Tr.

at 399-400.)   When polled, each juror confirmed that the verdict was his or her own.

### i. Motion to Set Aside the Verdict

On October 17, 2000, petitioner filed a motion under § 330.30(2) of the New York Criminal Procedure Law to set aside the verdict.   Petitioner alleged that a juror, Rufus Harlee, had tainted the deliberations by introducing facts that were not presented at trial.   Petitioner had learned of these allegations through Smith, who had contacted his attorney after the trial.   The court held a § 330.30(2) hearing on April 5, April 9, and June 15, 2001.   Smith testified at the hearing that, during the deliberations, Harlee told the jurors that he had a cousin who lived in the building where the crime occurred.   (April 5, 2001 Hearing Transcript at 43.)   Harlee also allegedly said that he visited his cousin during the trial, and while there, he saw Powell, who appeared frightened.   (April 5, 2001 Hearing Transcript at 43-44.) According to Smith, Harlee also told the jurors that: (1) petitioner has an arrest record; (2) petitioner had prior altercations with Powell; (3) Powell was terrified of petitioner and did not want to go to the police; and (4) the children who had witnessed the crime would be, or had been, moved upstate for their protection. (April 5, 2001 Hearing Transcript at 44.)   Smith also testified that she was "pretty sure" that she heard Harlee mention, in a side conversation with another juror, that petitioner had previously killed someone.   (April 5, 2001 Hearing Transcript at 44.) Smith testified that Harlee made these statements when Smith was the only hold out juror.   According to Smith, there was "no way" she would have voted for a guilty verdict if she had not believed some of Harlee's remarks.   (April 5, 2001 Hearing

7

Transcript at 57.)  She also testified that, while deliberating, she did not believe that his comments affected her, but she now believed that they may have played a role.  (April 5, 2001 Hearing Transcript at 53, 55-59.)

Smith admitted that when she sent her note to the court complaining about the deliberations, she did not mention Harlee's comments. (April 9, 2001 Hearing Transcript at 9, 12.)  Furthermore, the note expressed her view that the prosecution had met their burden of proof as to one or more of the counts.  (April 9, 2001 Hearing Transcript at 14-15.)  However, she further testified that those statements about the prosecution's case did not reflect her actual beliefs.  (*Id.*)  Smith admitted that she did not raise her concerns about Harlee when the jury notified the court that they reached a verdict, nor did she voice any concerns when the court polled the jurors to affirm the verdict.  (April 9, 2001 Hearing Transcript at 18, 20.)

Smith testified that, after the trial, she communicated with petitioner's counsel, Susan Costigan, on several occasions.  The first time was on the courthouse steps, right after the trial.  (April 9, 2001 Hearing Transcript at 22, 26, 29.)  Smith then left Costigan a voicemail the next day and they spoke when Costigan returned her call.  (*Id.*)  Smith did not mention Harlee's alleged misconduct when they spoke on the courthouse steps or when she left the message. (*Id.*)  When Costigan returned her call, Smith explained that the purpose of her first call was to recount the unpleasant nature of the deliberations and to try to obtain a more lenient sentence for petitioner.  (April 9, 2001 Hearing Transcript at 25-26.)  Costigan gave the same account of these three communications. (April 5,

8

2001 Hearing Transcript at 17-18, 20, 25-29, 34-35.)

Harlee was the final witness at the hearing and denied making any of the alleged statements. He testified that his cousin lived in the building where the crime took place, but he only visited his cousin three or four times in the last twenty years and never spoke with his cousin or visited the building during the trial. (June 15, 2001 Hearing Transcript at 3, 12-13, 19.) He also testified that, during the deliberations, all of the jurors discussed Powell's fearful demeanor at trial, noting specifically how he kept his head down during his testimony. (June 15, 2001 Hearing Transcript at 9.) Harlee explained that the only time he ever mentioned that his cousin lived in the building was after the trial, when he spoke to another juror in Smith's presence. (June 15, 2001 Hearing Transcript at 17-20.)

On July 2, 2001, the court denied petitioner's § 330.30(2) motion and sentenced him as a second violent felony offender to concurrent prison terms of thirteen years for Robbery in the Second Degree, seven years for Assault in the Second Degree, and one year for Criminal Possession of Ammunition. On October 9, 2001, the court issued a written decision supporting its denial of petitioner's motion. The court held that petitioner did not meet his burden of establishing misconduct by a preponderance of the evidence under C.P.L. § 330.40(2)(g). The court explained that:

> [w]hile the charges of misconduct are serious and if proven would constitute a basis for vacating the conviction, they were denied in all respects by [Rufus Harlee] and not corroborated by any other evidence. Further, [Rufus Harlee] plausibly explained how [Jocelyn Smith] might have become aware that a relative of his lived in the building (with

such knowledge then providing a basis for confusion in the mind of [Jocelyn Smith] as to the circumstances in which she learned it). Similarly, it does not seem unlikely that, as stated by [Rufus Harlee], some jurors concluded from Mr. Powell's demeanor and testimony – contradicting his prior sworn testimony and exculpating defendant – that Mr. Powell was a nervous and fitful witness. Comments of that sort by [Rufus Harlee] might also have provided a basis for a confused recollection and the impression that he was speaking from personal knowledge. Further, since emotions ran high during deliberations, it would not be surprising if one juror or another – based upon the evidence – used derogatory terms in referring to the defendant. Derogatory references coupled with heated deliberation would also provide a basis for a less than accurate interpretation or recollection as to what had been said, especially on the part of a juror who regretted having joined in the verdict and – after research of the law and advice by a law professor concerning jury misconduct – attempted to reconstruct in her memory what had occurred. The doubts about the accuracy of [Jocelyn Smith]'s recollection are heightened by her failure to – having been trained in the law – report such misconduct to the court when it purportedly occurred, or to bring it up when the jury was polled, or to report it to the defense attorney during the discussion on the courthouse steps immediately after the verdict or even in her first telephone call to the defense attorney a day later.

(Decision and Sentence dated July 2, 2001 at 1-12.)

   c.  Procedural History

Petitioner appealed his conviction to the Appellate Division. He argued that: (1) the court delivered an unbalanced *Allen* charge; (2) the court improperly responded to Smith's note; (3) Smith's testimony established that outside information affected the verdict; and (4) he received ineffective assistance of counsel because his attorney testified as a prosecution witness at the juror misconduct hearing. On February 7, 2005, the Appellate Division affirmed the conviction. *People v. Battle*, 15 A.D.3d 413 (2d Dep't 2005). The Appellate Division found that petitioner's claims concerning the *Allen* charge and the handling of the note were

unpreserved for appellate review because petitioner did not raise them during trial, and in any event, they were without merit. *Id.* The Appellate Division also held that petitioner did not prove that there had been juror misconduct. *Id.* With respect to the claim for ineffective assistance of counsel, the court held that the testimony of petitioner's attorney did not create a conflict of interest.

Petitioner sought leave to appeal to the New York State Court of Appeals, raising the same claims that he had raised below. The Court of Appeals denied the application on July 18, 2005. *People v. Battle*, 5 N.Y.3d 785 (N.Y. 2005). He then filed this petition on April 6, 2006.

## II. Discussion

### a. Legal Standards

The Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA") narrowed the scope of federal habeas review of state convictions when the state courts have adjudicated a petitioner's federal claims on the merits. Under the AEDPA standard, which governs the review of petitions challenging state convictions entered after 1996, federal courts may grant habeas relief only if the state court's adjudication on the merits:

> (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or
> (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

28 U.S.C. § 2254(d). A decision is "contrary to" federal law "if the state court

arrives at a conclusion opposite to that reached by [the Supreme Court] on a question of law or if the state court decides a case differently than [the Supreme Court] has on a set of materially indistinguishable facts." *Williams v. Taylor*, 529 U.S. 362, 412-12 (2000). An "unreasonable determination" is one in which "the state court identifie[d] the correct governing legal principle from [the Supreme Court's] decisions but unreasonably applie[d] that principle to the facts of the prisoner's case." *Id.* at 413. A federal court may not grant relief "simply because that court concludes in its independent judgment that the relevant state-court decision applied clearly established federal law erroneously or incorrectly." *Id.* at 411. Rather, the state court's application must have been "objectively reasonable." *Id.* at 409. "[A] determination of a factual issue made by a State court shall be presumed to be correct," and "[t]he applicant shall have the burden of rebutting the presumption of correctness by clear and convincing evidence." 28 U.S.C. § 2254(e)(1).

"A district court must dismiss any petition for habeas corpus, brought pursuant to 28 U.S.C. § 2254, that contains issues not exhausted in the state courts." *McKethan v. Mantello*, 292 F.3d 119, 122 (2d Cir. 2002). When a petitioner presents the district court with a "mixed petition," including both exhausted and unexhausted issues, the court can offer the petitioner "the choice of returning to the state court to exhaust his claims or of amending or resubmitting the habeas petition to present only the exhausted claims." *McKethan*, 292 F.3d at 122 (citations omitted). "Alternatively, a district court may also dismiss the petition with a judgment on the merits." *Id.* (citation omitted); *see also* 28 U.S.C. § 2254(b)(2) ("An

12

application for writ of habeas corpus may be denied on the merits, notwithstanding the failure of the applicant to exhaust the remedies available in the court of the State.").

> State remedies are deemed exhausted when a petitioner has: (i) presented the federal constitutional claim asserted in the petition to the highest state court (after preserving it as required by state law in lower courts) and (ii) informed that court (and lower courts) about both the factual and legal bases for the federal claim. Moreover, even if a federal claim has not been presented to the highest state court or preserved in lower state courts under state law, it will be deemed exhausted if it is, as a result, then procedurally barred under state law.

*McKethan v. Mantello*, 292 F.3d 119, 122 (2d Cir. 2002) (citations and internal quotation marks omitted).

District courts cannot review a state prisoner's federal claims that are barred by an independent and adequate state procedural rule, "unless the prisoner can demonstrate cause for the default and actual prejudice as a result of the alleged violation of federal law, or demonstrate that failure to consider the claims will result in a fundamental miscarriage of justice." *Coleman v. Thompson*, 501 U.S. 722, 750 (1991). If a state court's holding contains a plain statement that a claim is procedurally barred based on a state rule, the federal court may not review it even if the state court also rejected the claim on the merits in the alternative. *See Harris v. Reed*, 489 U.S. 255, 264 n.10 (1989); *accord Fama v. Comm. Of Corr. Servs.*, 235 F.3d 804, 811 n.4 (2d Cir. 2000) ("[W]e have held that where a state court says that a claim is 'not preserved for appellate review' and then ruled 'in any event' on the merits, such a claim is not preserved."). On the other hand, if the state court holds

13

that a claim is either unpreserved for appellate review or without merit, the claim is deemed preserved and therefore subject to habeas review. *Fama*, 235 F.3d at 810-11.

Because petitioner is a *pro se* litigant, the court holds his pleadings to "less stringent standards than formal pleadings drafted by lawyers." *Haines v. Kerner*, 404 U.S. 519, 520 (1972). The court interprets the petition "to raise the strongest arguments that they suggest." *Triestman v. Fed. Bureau of Prisons*, 470 F.3d 471, 474 (2d Cir. 2006) (emphasis omitted).

b. Right to a Fair Hearing

Petitioner claims that the state courts violated his due process rights by denying him a fair post-verdict hearing on the alleged juror misconduct. Specifically, petitioner argues that, when he moved to set aside the verdict, the Appellate Division should have released the names and addresses of all of the jurors. This claim is procedurally barred. As an initial matter, petitioner never asked for this information: the prosecution did. Furthermore, when the Appellate Division denied the request, petitioner did not object, move for reconsideration, or appeal. Therefore, under § 2254, the court will only deem the claim exhausted if petitioner is now procedurally barred from raising it in state court. *See McKethan v. Mantello*, 292 F.3d 119, 122 (2d Cir. 2002). This claim is procedurally barred under New York law—and therefore exhausted—because petitioner could have, but did not raise it in his prior appeals. *See Washington v. James*, 996 F.2d 1442, 1447 (2d Cir. 1993) (citations omitted).

Exhaustion in this sense, however, does not automatically make the claim proper for federal habeas review. The court may only review such a claim if the prisoner can demonstrate cause and prejudice for the default, or if he can demonstrate that failure to review the claim will result in a fundamental miscarriage of justice. *Coleman v. Thompson*, 501 U.S. 722, 750 (1991). Petitioner does not argue that he had reason for this default, nor does the court see any basis for such an argument. Therefore, petitioner can only avoid the consequences of his procedural default if he can show that he is actually innocent.

This exception, however, is "extremely rare" and applies only in "extraordinary cases." *Schlup v. Delo*, 513 U.S. 298, 321-22 (1995). "Actual innocence means factual innocence, not mere legal insufficiency." *Bousley v. United States*, 523 U.S. 614, 623 (1998) (internal quotation marks omitted); *Sweet v. Bennett*, 353 F.3d 135, 142 (2d Cir. 2003) ("more likely than not that no reasonable juror would have concluded that [the petitioner] engaged in conduct that meets the required elements of each of the charges."). "To establish actual innocence, [a] petitioner must demonstrate that, in light of all the evidence, it is more likely than not that no reasonable juror would have convicted him." *Id.* (citation and internal quotation marks omitted). In other words, is it "more likely than not that no reasonable juror would have concluded that [the petitioner] engaged in conduct that meets the required elements of each of the charges." *Sweet v. Bennett*, 353 F.3d 135, 142 (2d Cir. 2003).

Petitioner cannot meet this burden. As a threshold matter, petitioner has

not argued that he was actually innocent. Furthermore, it is clear from the record that petitioner could not make such a showing. In addition to Powell's prior statements, the three children, who were present during the robbery and were all familiar with petitioner, testified that he robbed and assaulted Powell. (Tr. at 35-37, 57, 62-64, 78-80, 129-33.) There were also physical evidence tying petitioner to the crimes—the police recovered the stolen Rolex watch and jewelry as well as live ammunition from petitioner. (Tr. at 185-191.) In view of this evidence, the court cannot conclude that it is "more likely than not that no reasonable juror would have concluded that [petitioner] engaged in conduct that meets the required elements of each of the charges." *Sweet*, 353 F.3d at 142. Because petitioner has not shown cause and prejudice or actual innocence, the court is barred from reviewing this claim on habeas review.

c. Juror Misconduct

Petitioner alleges that Harlee shared information with the other jurors that had not been introduced at the trial, thereby violating his rights under the Sixth and Fourteenth Amendments. The Appellate Division rejected this claim, finding that the trial court's determination that no juror misconduct had occurred was not clearly erroneous and, therefore, should not be disturbed. *People v. Battle*, 15 A.D.3d 413, 414 (2nd Dep't 2005). Because the Appellate Division rejected this claim on its merits, the claim is subject to federal habeas review.

"[A] determination of a factual issue made by a State court shall be presumed to be correct," and "[t]he applicant shall have the burden of rebutting the

presumption of correctness by clear and convincing evidence." 28 U.S.C. § 2254(e)(1); *see Miller-El v. Cockrell*, 537 U.S. 322, 339 (2003) ("[A] decision adjudicated on the merits in a state court and based on a factual determination will not be overturned on factual grounds unless objectively unreasonable in light of the evidence presented in the state-court proceeding."). Petitioner has not rebutted this presumption. Petitioner primarily relies on Smith's allegations against Harlee. The trial court, however, had ample reason to discount her testimony. Smith failed to adequately explain why she did not mention Harlee's alleged misconduct until several days after it occurred despite having numerous opportunities to do so. She did not voice any concerns in her note to the court or when individually polled. She also did not tell petitioner's counsel about the alleged statements when they spoke immediately after the verdict and later, when she first called petitioner's counsel.

Additionally, the information that Smith claimed that she learned from Harlee during the deliberations could be attributed to other sources. Harlee testified that, after the verdict, in Smith's presence, he talked about his cousin, who lived in the building where the crime had occurred. Harlee also testified that during the deliberations, all of the jurors discussed Powell's fearful demeanor at trial. In light of this evidence, the court's finding—that Smith probably became confused about how she learned about Harlee's cousin and Powell's fear, particularly given the intensity of the deliberations—was not "objectively unreasonable." *Miller-El*, 537 US at 339. Petitioner has not provided clear and convincing evidence showing that the state court's decision was objectively incorrect. Therefore, habeas relief as

17

to this claim is denied.

        d.  The Court's Handling of Smith's Note and the *Allen* Charge

Petitioner's claims regarding the trial court's handling of the note from Smith and the *Allen* charge are procedurally barred. The Appellate Division found that both claims were unpreserved for appellate review because petitioner failed to timely object. *People v. Battle*, 15 A.D.3d 413, 414 (2d Dep't 2005). The Appellate Division also held that, in any event, both claims were meritless. *Id.* This holding provides an independent and adequate procedural bar for rejecting petitioner's claims. *See Harris v. Reed*, 489 U.S. 255, 264 n.10 (1989); *accord Fama v. Comm. Of Corr. Servs.*, 235 F.3d 804, 811 n.4 (2d Cir. 2000).

Federal courts look to federal law to determine whether a state procedural rule is an independent and adequate bar to reviewing a federal question. *Garvey v. Duncan*, 485 F.3d 709, 714 (2d Cir. 2007). It is well settled that the Appellate Division's holding that petitioner's claim was unpreserved for appellate review constitutes an "independent" ground of decision even though the court also discussed the merits of the underlying claim. *See, e.g., Garcia v. Lewis*, 188 F.3d 71, 77 (2d Cir. 1999) ("There is no question that the Appellate Division's explicit invocation of the procedural bar constitutes an 'independent' state ground, even though the court spoke to the merits of [the] claim in an alternative holding.") (citing *Harris*, 489 U.S. at 263, 264 n.10). An independent state law ground is "only adequate to support the judgment and foreclose review of a federal claim if it is 'firmly established and regularly followed' in the state"; however, "even firmly established and regularly

followed state rules will not foreclose review of a federal claim if the application of the rule in a particular case is 'exorbitant.'" *Garvey*, 485 F.3d at 713-14 (quoting *Lee v. Kemna*, 534 U.S. 362, 376 (2002)).

New York's contemporaneous objection rule under C.P.L. § 470.05(2) is firmly established and regularly followed by the New York courts, *Garcia*, 188 F.3d at 78-79, and applying the rule here was not exorbitant. In *Lee v. Kemna*, the Supreme Court set forth several guideposts to determine whether the application of a firmly established and regularly followed state procedural rule would be exorbitant:

(1)    whether the alleged procedural violation was actually relied on in the trial court, and whether perfect compliance with the state rule would have changed the trial court's decision;

(2)    whether state caselaw indicated that compliance with the rule was demanded in the specific circumstances presented; and

(3)    whether petitioner had "substantially complied" with the rule given "the realities of trial," and, therefore, whether demanding perfect compliance with the rule would serve a legitimate government interest.

*Cotto v. Herbert*, 331 F.3d 217, 240 (2d Cir. 2003) (quoting *Lee*, 534 U.S. at 381-85).

Turning to the first *Lee* factor, the trial court clearly could not have relied on petitioner's violation of the contemporaneous objection rule—by definition, such a violation cannot occur until a party reaches the appellate court and attempts to raise an argument that has not been preserved. *See Garvey*, 485 F.3d at 719. Accordingly, the first consideration from *Lee* does not support a finding that the application of § 470.05(2) in petitioner's case was exorbitant.

Regarding the second and third *Lee* factors, the court must consider whether

New York's contemporaneous objection rule is firmly established and regularly followed in the particular circumstances of petitioner's case, and whether petitioner "substantially complied" with the rule given the realities of trial. *See Lee*, 534 U.S. at 382; *Cotto*, 331 F.3d at 244. It is well established that New York courts will not review unpreserved claims. *See Garcia*, 188 F.3d at 82. Furthermore, when a defendant makes no objection to the court's ruling, the defendant cannot be said to have substantially complied with § 470.05(2). *Cf. Garvey*, 485 F.3d at 714 (collecting cases). Accordingly, under the *Lee* factors, the Appellate Division's application of the rule was not exorbitant. *See Richardson v. Greene*, 497 F.3d 212, 220 (2d Cir. 2007) ("Where the case law interpreting New York's preservation rule in criminal proceedings displays consistent application in a context similar to the one before us, the rule is firmly established, regularly followed, and hence adequate for purposes of the independent and adequate state ground doctrine."). Thus, the court holds that the Appellate Division's decision constituted an adequate ground of decision independent of petitioner's federal claim.

Even when an adequate and independent state ground bars a claim, the federal court may consider the claim if "the prisoner can demonstrate cause for the default and actual prejudice as a result of the alleged violation of federal law, or demonstrate that failure to consider the claims will result in a fundamental miscarriage of justice." *Coleman*, 501 U.S. at 750. The only cause for the default here was the trial counsel's failure to object. Such inadvertence or negligence does not overcome a procedural default. *Id.* at 753; *see also Amadeo v. Zant*, 486 U.S.

214, 222 (1988) (citation omitted) ("[T]he existence of cause for a procedural default must ordinarily turn on whether the prisoner can show that some objective factor external to the defense impeded counsel's efforts to comply with the State's procedural rule."). As discussed above, petitioner is also unable to overcome the default by claiming a fundamental miscarriage of justice. *See Schlup v. Delo*, 513 U.S. 298, 324 (1995). Accordingly, petitioner is procedurally barred from federal review of this claim.

Even if the court were to look past this procedural bar, petitioner would not prevail on these two claims. "A traditional *Allen* charge reminds the jurors about the importance of obtaining a verdict and encourages jurors to listen to each other's arguments while also emphasizing that the verdict must be the verdict of each individual juror, and not a mere acquiescence in the conclusion of his fellows." *Smalls v. Batista*, 191 F.3d 272, 275 n.1 (2d Cir. 1999) (internal quotations marks omitted). The trial court's *Allen* charge did both. Instructing the entire jury, the court addressed both the majority and the minority, asking both sides to consider whether their respective views were well founded. The court stated that "[i]f you are in the minority, consider whether your position is well taken in light of all the elements and the fact that the majority has a different view. If you're in the majority, consider whether your position is well founded." (Tr. at 372-374.) Thus, the court agrees with the Appellate Division that the *Allen* charge was balanced.

With respect to Smith's note, petitioner faults the trial court for not showing the note to the attorneys before speaking with Smith. The court finds that this

decision was justified. The note was a personal communication from Smith, and she did not send it through the jury foreman as the court had instructed. Furthermore, the court clerk indicated that the note might contain confidential information about deliberations. Therefore, rather than immediately reading the note, the court took reasonable precautions to avoid a mistrial. It first questioned Smith and confirmed that the note did contain confidential information. The court then re-emphasized to Smith, and later to all of the jurors, the importance of keeping their deliberations confidential. The next day, with the consent of the parties, the court read the note in open court. After reading the note, the court asked the parties for "question or comment." (Tr. at 396.) Petitioner said nothing. (Tr. at 397.) Having declined the court's invitation to express any concerns or to propose any court action, petitioner cannot now complain that the court failed to adequately address his concerns regarding the note. In sum, petitioner's claims regarding the court's handling of Smith's note and the *Allen* charge are procedurally barred and meritless.

III. Conclusion

For the reasons set forth above, the court denies Battle's petition for a writ of habeas corpus. The court also denies a certificate of appealability as petitioner failed to make a "substantial showing of the denial of a constitutional right." 28 U.S.C. § 2253(c)(2); *see* Fed. R. App. 22(b); *Miller-El v. Cockrell*, 537 U.S. 322, 336 (2003); *Luciadore v. New York State Div. of Parole*, 209 F.3d 107, 112 (2d Cir. 2000). The court certifies pursuant to 28 U.S.C. § 1915(a)(3) that any appeal from this order would not be taken in good faith and therefore *in forma pauperis* status is denied for purpose of an appeal. *See Coppedge v. United States*, 369 U.S. 438, 444-45 (1962).

SO ORDERED

DATED:     Brooklyn, New York
           September 28, 2009

                                      /s/
                                 Dora L. Irizarry
                      United States District Judge